Opinion by Judge BERZON.
Concurrence by Judge KLEINFELD.
Partial Concurrence and Partial Dissent by Judge O’SCANNLAIN.
OPINION
BERZON, Circuit Judge:
A special agent of the Naval Criminal Investigative Service (NCIS) launched an investigation for online criminal activity by anyone in the state of Washington, whether connected with the military or not. The agent found evidence of a crime committed by a civilian in the state and turned it over to civilian law enforcement officials. The civilian, Michael Dreyer, was prosecuted, convicted, and sentenced to eighteen years in prison. We hold that the NCIS agent’s investigation constituted improper military enforcement of civilian laws and that the evidence collected as a result of that investigation should have been suppressed.
BACKGROUND
In late 2010, NCIS Special Agent Steve Logan began investigating the distribution of child pornography online. Several months later, from his office in Georgia, Agent Logan used a software program, RoundUp, to search for any computers located in Washington state sharing known *828 child pornography on the Gnutella file-sharing network.[1]
Agent Logan found a computer using the Internet Protocol (IP) address 67.160.77.21 sharing several files identified by RoundUp as child pornography.[2] He downloaded three of the files, two images and a video, from that computer. After viewing the files, Agent Logan concluded that they were child pornography.
Thereafter, Agent Logan made a request for an administrative subpoena for the name and address associated at the time of the downloads with the IP address. He submitted his request to NCIS’s representative at the National Center for Missing and Exploited Children, which turned the request over to the Federal Bureau of Investigation (FBI). The FBI sent an administrative subpoena to Comcast. Com-cast responded by providing Dreyer’s name and address in Algona, Washington.
After receiving that information, Agent Logan checked a Department of Defense (DoD) database to determine if Dreyer had a military affiliation. He found that Dreyer had no current military affiliation.[3] Agent Logan then wrote a report summarizing his investigation and forwarded it and the supporting material to the NCIS office in the state of Washington. That office then turned the information over to Officer James Schrimpsher of the Algona Police Department.
Officer Schrimpsher verified that Dreyer lived in Algona based on property and utility records. Because Officer Schrimpsher had never worked on any case involving internet crimes or child pornography, he contacted the Internet Crimes Against Children Task Force for assistance and was referred to Detective Ian Polhemus of the Seattle Police Department. Detective Polhemus reviewed some of the information in the NCIS report, and provided Officer Schrimpsher with a sample of a search warrant affidavit.
Subsequently, Officer Schrimpsher sought, and was issued, a search warrant by a state court judge.[4] Officer Schrimpsher, along with several other officers, including Detective Polhemus, Detective Timothy Luckie of the Seattle Police Department, and Sergeant Lee Gaskill of the Algona Police Department, executed the search warrant. At Dreyer’s residence, Detective Luckie conducted an on-site “preview” search of a desktop computer he found in the house.[5] He identified *829 some images as possible child pornography and directed the Algona officers to seize the computer.
Months later, United States Department of Homeland Security Special Agent Cao Triet Huynh applied for a warrant to search the electronic media seized from Dreyer’s home. Huynh based his application on the media found by Agent Logan and Detective Luckie, as well as incriminating statements Dreyer made during the car ride. A federal magistrate judge issued a search warrant. The resulting forensic examination of Dreyer’s computer revealed many videos and images of child pornography.
Dreyer was charged with one count of distributing child pornography on April 14, 2011 in violation of 18 U.S.C. §§ 2252(a)(2) and (b)(1), and one count of possessing child pornography on July 6, 2011 in violation of 18 U.S.C. §§ 2252(a)(4)(B) and (b)(2). He moved to suppress the evidence seized during the July 6, 2011 search, as well as the evidence found during the later federal search of the computer.
In his reply brief on his suppression motion, Dreyer argued that, as an NCIS agent, Agent Logan had no lawful authority to investigate civilian crime. The government filed a surreply addressing that argument. The parties addressed this issue again at the hearing on the motion to suppress. Following an evidentiary hearing, the district court orally denied his motion to suppress.
Subsequently, following a four-day jury trial, Dreyer was convicted of both charges and sentenced to 216 months of incarceration and lifetime supervised release. He timely appealed.
DISCUSSION
Dreyer argues that the fruits of the NCIS investigation into his online file sharing should have been suppressed because military enforcement of civilian laws is prohibited. Because the issue of whether the NCIS involvement violated the limitations on military enforcement of civilian laws “is a mixed question of fact and law which is primarily legal,” we review de novo the district court’s denial of Dreyer’s motion to suppress based on this claim. United States v. Hitchcock, 286 F.3d 1064, 1069 (9th Cir.), as amended by 298 F.3d 1021 (9th Cir.2002).
I.
The Posse Comitatus Act (PCA), 18 U.S.C. § 1385,[6] “prohibits Army and Air Force military personnel from participating in civilian law enforcement activities.” United States v. Chon, 210 F.3d 990, 993 (9th Cir.2000).[7] In addition, Com *830 gress has directed “[t]he Secretary of Defense [to] prescribe such regulations as may be necessary” to prevent “direct participation by a member of the Army, Navy, Air Force, or Marine Corps” in civilian law enforcement activities unless otherwise authorized by law. 10 U.S.C. § 375. Congress has authorized certain exceptions to § 375, such as permitting the military to make equipment and facilities available to civilian law enforcement and allowing the military to provide support in particular situations, such as during an emergency situation involving a weapon of mass destruction. See 10 U.S.C. §§ 372-74, 379-82. None of these specific exceptions are at issue here.
We have previously recognized that, “[although the PCA does not directly reference the Navy,” “PCA-like restrictions” apply to the Navy as a matter of Department of Defense (DoD) and Naval policy. Chon, 210 F.3d at 993; see also United States v. Khan, 35 F.3d 426, 431 (9th Cir.1994). Specifically, DoD policy states that its “guidance on the Posse Comitatus Act ... is applicable to the Department of the Navy and the Marine Corps as a matter of DoD policy, with such exceptions as may be provided by the Secretary of the Navy-on a case-by-case basis.” DoD Directive (DoDD) 5525.5 Enclosure 4 E4.3 (Jan. 15, 1986).[8] “[T]he Secretary of the Navy, using nearly identical language, has adopted this policy.” Chon, 210 F.3d at 993 (citing former Secretary of the Navy Instructions (SECNAVINST) 5820.7B (March 28, 1988)); see SECNAVINST 5820.7C (Jan. 26, 2006).
The government maintains that, even though PCA-like restrictions apply to the Navy, they do not apply to civilian NCIS agents. Chon rejected the same argument. There, as here, the government argued that “§ 375 does not apply to the NCIS because most of its agents are civilians,” and “it is headed by a civilian director with a civilian chain of command.” Id. at 993-94. The government based its first argument on provisions in DoD and Naval policies that
exempt four categories of people from PCA-like restrictions: (1) members of reserve components when not on active duty; (2) members of the National Guard when not in the Federal Service; (3) civilian employees of DoD unless under the direct command and control of a military officer; and (4) military service members when off duty and in a private capacity.
*831 Id. at 993. Chon interpreted “these exemptions to mean that the PCA and PCA-like restrictions function to proscribe use of the strength and authority of the military rather than use of the private force of the individuals who make up the institution.” Id. “In other words, while DoD personnel may participate in civilian law enforcement activities in their private capacities, they may not do so under the auspices of the military.” Id. Applying this understanding, Chon held that the PCA-like restrictions do apply to “civilian NCIS agents” who “represented and furthered the interests of the Navy,” and were not distinguishable by the civilians who might interact with them from members of the military. Id. These same status-based exemptions are maintained in the regulations and policies today. See SECNAVINST 5820.7C(8)(e)(l)-(4); DoDD 5525.5, Enclosure 4 E4.2; see also 32 C.F.R. § 182.6(a)(2); DoDI 3025.21, Enclosure 3(2). We see no basis for revisiting our prior interpretation of them.
Chon also rejected the government’s second contention, “that the NCIS should be exempt from PCA-like restrictions because it is headed by a civilian director with a civilian chain of command.” 210 F.3d at 993-94. The court reasoned that “the NCIS Director has a direct reporting relationship to the Chief of the Naval Operations, a military officer,” and so “[despite a civilian Director, the NCIS continues to be a unit of, and accountable to, the Navy.” Id. The government argues that Chon’s reasoning has been undermined, because the “reporting relationship” between the NCIS director and the Chief of Naval Operations “was eliminated in 2005” when the Secretary of the Navy issued Instruction 5430.107.
The government is incorrect. At the time that Chon was decided, the command structure of NCIS was set forth in Instruction 5520.3B, which provided, “The Director, NCIS reports directly to the Secretary of the Navy,” and “[i]n addition, the Director, NCIS reports to the Chief of Naval Operations for physical, personnel and information security.” SECNA-VINST 5520.3B(4). Instruction 5430.107 has since cancelled Instruction 5520.3B, see SECNAVINST 5430.107(2) (Dec. 28, 2005), and now provides, “The Director, NCIS reports directly to the Secretary of the Navy,” and “[i]n addition, the Director, NCIS serves as Special Assistant for Naval Investigative Matters and Security to the Chief of Naval Operations,” SECNA-VINST 5430.107(5)(a). That the NCIS director still serves as the “Special Assistant” to the Chief of Naval Operations means a reporting relationship continues to exist. In addition, Instruction 5430.107 created a Board of Directors that oversees NCIS strategy and operations; the Board includes several military officers. See SECNAVINST 5430.107(5)(c) (establishing Board of Directors including the Vice Chief of Naval Operations and the Assistant Commandant of the Marine Corps). So the change in NCIS’s policies regarding its command structure did not undermine this portion of Chon’s reasoning.
More fundamentally, the government’s assertion that there is a meaningful difference between civilian and other employees of the Navy for the purposes of the PCA-like restrictions is unsound. The DoD policies have consistently proclaimed that they set forth “restrictions on participation of DoD personnel in civilian law enforcement activities.” See DoDD 5525.5, Enclosure 4; DoDI 3025.21, Enclosure 3. They do not limit their reach to non-civilian personnel only. And any contention to the contrary is belied by the abundantly clear expressions in the most recent regulations and policy instructions. Both state that they “[a]ppl[y] to civilian employees of the DoD Components,” and that their restric *832 tions on direct participation in civilian law enforcement “apply to all actions of DoD personnel worldwide,” with “DoD personnel” defined to include “Federal military officers and enlisted personnel and civilian employees of the Department of Defense.” 32 C.F.R. §§ 182.2(e), 182.3, 182.4(c); DoDI 3025.21(2)(e), (4)(c), Glossary Part II.[9]
Accordingly, we re-affirm Chon's holding that NCIS agents are bound by PCA-like restrictions on direct assistance to civilian law enforcement.
II.
The regulations and policies implementing the PCA and § 375 “generally prohibit ‘direct’ military involvement in civilian law enforcement activities but permit ‘indirect’ assistance such as the transfer of information obtained during the normal course of military operations or other actions that ‘do not subject civilians to [the] use [of] military power that is regulatory, prescriptive, or compulsory.’ ” United States v. Hitchcock, 286 F.3d at 1069 (citations omitted). Prohibited direct assistance includes “[u]se of military personnel for surveillance or pursuit of individuals, or as undercover agents, informants, investigators, or interrogators.” DoDD 5525.5, Enclosure 4, E4.1.3.4.
We have “set forth three tests for determining whether military involvement in civilian law enforcement constitutes permissible indirect assistance: ‘[1] The involvement must not constitute the exercise of regulatory, proscriptive, or compulsory military power, [2] must not amount to direct active involvement in the execution of the laws, and [3] must not pervade the activities of civilian authorities.’ ” Hitchcock, 286 F.3d at 1069 (quoting Khan, 35 F.3d at 431).[10] “If any one of these tests is met, the assistance is not indirect.” Khan, 35 F.3d at 431.
Agent Logan’s RoundUp surveillance of all computers in Washington amounted to impermissible direct active involvement in civilian enforcement of the child pornography laws, not permissible indirect assistance. He acted as an investigator, an activity specifically prohibited as direct assistance. DoDD 5525.5, Enclosure 4, E4.1.3.4; see also Red Feather, 392 F.Supp. at 925 (“Activities which constitute an active role in direct law enforcement” include “investigation of crime ... and other like activities.”). Agent Logan’s actions were akin to the conduct that the Fourth Circuit held violated these regulations in United States v. Walden, 490 F.2d 372, 373-76 (4th Cir.1974), where Marines engaged in undercover investigations into store employees’ illegal firearms sales to minors and to individuals not residents of the state.
*833 Also, Agent Logan engaged in his investigation not in any support capacity to civilian law enforcement, but rather as an independent actor who initiated and carried out this activity. His actions thus were not “incidental” to the overall investigation into Dreyer, or limited to backup support. Cf Khan, 35 F.3d at 432; United States v. Klimavicius-Viloria, 144 F.3d 1249, 1259 (9th Cir.1998). The results of his investigation served as the primary basis for the state search warrant. Officer Sehrimpsher conducted no significant additional investigation before procuring the warrant—he only verified that Dreyer lived at the address he was given and that the descriptions that Agent Logan provided of the files seemed to describe child pornography. Without Agent Logan’s identification of Dreyer, his computer, and the child pornography on his computer, there would have been no search and no prosecution.
Accordingly, Agent Logan’s actions amounted to direct assistance to civilian law enforcement. The government nonetheless argues that Agent Logan’s investigation was proper because it falls into the “independent military purpose” exception to the prohibition on direct assistance.
The policies and regulations create “an exception to the general prohibition on direct involvement where” there is “an independent military purpose,” that is, “where the military participation is undertaken ‘for the primary purpose of furthering a military or foreign affairs function of the United States, regardless of incidental benefits to civilian authorities.’ ” Hitchcock, 286 F.3d at 1069 (quoting DoD Directive 5525.5, Enclosure 4, E4.1.2.1). Such military activities include “[i]nvesti-gations and other actions related to enforcement of the Uniform Code of Military Justice.” DoD Directive 5525.5, Enclosure 4, E.4.1.2.1.1.
The Uniform Code of Military Justice prohibits distribution of child pornography by a member of the armed forces. It has assimilated the elements of the federal child pornography statute through Article 134, its general provision that prohibits “all conduct of a nature to bring discredit upon the armed forces.” 10 U.S.C. § 934; see, e.g., United States v. Brown, 529 F.3d 1260, 1263-64 (10th Cir.2008). In 2011, the President issued Executive Order 13593, adding to the Manual for Courts Martial a specific Article 134 provision for child pornography. Investigation by military law enforcement officers of possession and distribution of child pornography by military personnel is therefore proper.
But Agent Logan’s search was not reasonably focused on carrying out such a legitimate military investigation.[11] NCIS is authorized to investigate criminal operations that “significantly affect the naval establishment.” SECNAVINST 5430.107(3)(c), 7(b)(2). Agent Logan understood that he did not have the authority to search any location, but had to limit his searches to areas where there was “a Department of Navy interest.” Yet, Agent Logan’s search did not meet the required limitation. He surveyed the entire state of Washington for computers sharing child pornography. His initial search was not limited to United States military or government computers, and, as the government acknowledged, Agent Logan had no *834 idea whether the computers searched belonged to someone with any “affiliation with the military at all.” Instead, it was his “standard practice to monitor all computers in a geographic area,” here, every computer in the state of Washington.
Agent Logan’s further investigation into Dreyer’s specific computer and identity also was not reasonably limited to searching for crimes that “significantly affect the naval establishment.” SECNAVTNST 5430.107(3)(e), 7(b)(2). Agent Logan testified that RoundUp displays the geographic location of the IP address “within a 25- to 30-mile radius.” The screen shot for Agent Logan’s search shows that RoundUp identified the geographic location for Dreyer’s IP address as Federal Way, Washington. Agent Logan did not report at the evidentiary hearing on the suppression motion or at trial that he chose to pursue that IP address based on this geographic identification.
Agent Logan did write in his administrative subpoena request that the “Suspect IP was identified in area of large DOD and USN saturation indicating likelihood of USN/DOD suspect.” But the record contains no evidence establishing any meaningful military “saturation” of the area at issue. Although the government represents that Federal Way, Washington is located within thirty miles of several military installations, it also is similarly near both Seattle and Tacoma, as well as much of the surrounding metropolitan areas.[12] The three-thousand-square-mile area circling Federal Way—the approximate area of a circle with a thirty-mile radius—encompasses much of the state’s civilian population. That Agent Logan ended his investigation once he confirmed that Dreyer had no current military affiliation is of no matter; his overly broad investigation until that point had already exceeded the scope of his authority.
The government’s position that the military may monitor and search all computers in a state even though it has no reason to believe that the computer’s owner has a military affiliation would render the PCA’s restrictions entirely meaningless. To accept that position would mean that NCIS agents could, for example, routinely stop suspected drunk drivers in downtown Seattle on the off-chance that a driver is a member of the military, and then turn over all information collected about civilians to the Seattle Police Department for prosecution.
The government’s position that the military may search the entire civilian popula *835 tion of a state is also inconsistent with a basic principle underlying the PCA and the related statutes and regulations, “a traditional and strong resistance of Americans to any military intrusion into civilian affairs.” Laird v. Tatum, 408 U.S. 1, 15, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972). The PCA was originally enacted on the understandings that “[t]he great beauty of our system of government is that it is to be governed by the people,” and that if we use the “military power ... to discharge those duties that belong to civil officers and to the citizens,” we “have given up the character of [our] Government; it is no longer a government for liberty; it is no longer a government founded in the consent of the people; it has become a government of force.” 7 Cong. Rec. 4247 (1878) (remarks of Sen. Benjamin Hill). Consistent with those fundamental premises, DoD policy warns against an expansive reading such as the one espoused by the government here: Directive 5525.5 specifically notes that the independent military purpose exception “must be used with caution, and does not include actions taken for the primary purpose of aiding civilian law enforcement officials or otherwise serving as a subterfuge to avoid the restrictions of’ the PCA. DoDD 5525.5, Enclosure 4, E.4.1.2.1.
The lack of any reasonable connection between the military and the crimes that Agent Logan was investigating separates this case from those in which we have applied the independent military purpose exception. In Hitchcock, for example, the defendant “sold LSD to Lake, a U.S. Marine, who was, in turn, selling LSD to other military personnel” on his base. 286 F.3d at 1066, 1070. NCIS agents participated in the investigation “in order to determine whether [the defendant] had sold drugs to other military personnel besides Lake.” Id. at 1070. Hitchcock held the independent military purpose exception applicable because the military participation was justified to “determin[e] the extent to which [the defendant’s] LSD was being used and distributed on the military base” in violation of the Uniform Code of Military Justice, and to help “ ‘maintain law and order on a military installation.’ ” Id. (quoting DoDD 5525.5, Enclosure 4, E4.1.2.1.3). And Chon applied the exception where NCIS agents were investigating the theft of military equipment from a Naval facility, and so were acting with “the independent military purpose of recovering military equipment.” 210 F.3d at 994.[13]
Thus, we hold that Agent Logan’s broad investigation into sharing of child pornography by anyone within the state of Washington, not just those on a military base or with a reasonable likelihood of a Navy affiliation, violated the regulations and policies proscribing direct military enforcement of civilian laws.
III.
Having held that Agent Logan’s investigation violated the restrictions on the use of the military to enforce civilians laws, we consider whether suppression of the resulting evidence should have been ordered here. We have held that “an exclusionary rule should not be applied to violations of 10 U.S.C. §§ 371-378 until a need *836 to deter future violations is demonstrated.” United States v. Roberts, 779 F.2d 565, 568 (9th Cir.1986), superseded by statute on other grounds as recognized in Khan, 35 F.3d at 432 n. 7. Such a need exists here, as there is evidence of “widespread and repeated violations” of these provisions. Id.
The record here demonstrates that Agent Logan and other NCIS agents routinely carry out broad surveillance activities that violate the restrictions on military enforcement of civilian law. Agent Logan testified that it was his standard practice to “monitor[] any computer IP address within a specific geographic location,” not just those “specific to U.S. military only, or U.S. government computers.” He did not try to isolate military service members within a geographic area. He appeared to believe that these overly broad investigations were permissible, because he was a “U.S. federal agent[ ]” and so could investigate violations of either the Uniform Code of Military Justice or federal law.
The extraordinary nature of the surveillance here demonstrates a need to deter future violations. So far as we can tell from the record, it has become a routine practice for the Navy to conduct surveillance of all the civilian computers in an entire state to see whether any child pornography can be found on them, and then to turn over the information to civilian law enforcement when no military connection exists. This is squarely a case of the military undertaking the initiative to enforce civilian law against civilians. “There must be an exceptional reason” to invoke the exclusionary rule for violation of posse comitatus-like regulations, United States v. Harrington, 681 F.2d 612, 615 (9th Cir.1982), and the broad use of military surveillance of overwhelmingly civilian populations is an exceptional reason.
Agent Logan carried out these searches repeatedly. He was monitoring another computer at the same time that he found Dreyer’s IP address. And he was involved with at least twenty other child pornography investigations. Further, Agent Logan was not the only NCIS agent who engaged in such searches. He began carrying out these searches with two other agents at least several months before he found Dreyer’s IP address.[14]
That a need to deter future violations exists is further supported by the government’s litigation positions. The government is arguing vehemently that the military may monitor for criminal activity all the computers anywhere in any state with a military base or installation, regardless of how likely or unlikely the computers are to be associated with a member of the military. Such an expansive reading of the military’s role in the enforcement of the civilian laws demonstrates a profound lack of regard for the important limitations on the role of the military in our civilian society.
The existence of these factors make this case unlike those in which courts have declined to require suppression of the evidence resulting from a violation of these laws. In Roberts, we concluded that suppression was not necessary because the violation there was not widespread or repeated. 779 F.2d at 568. Similarly, in United States v. Walden, 490 F.2d 372, 377 (4th Cir.1974), after holding that the Marines’ activities violated the Navy regulations, the Fourth Circuit declined to require suppression, based primarily on “the *837 fact that this case is the first instance to our knowledge in which military personnel have been used as the principal investigators of civilian crimes in violation of the Instruction,” and so it was unaware of “any other violation, let alone widespread or repeated violations.” And in United States v. Johnson, 410 F.3d 137, 149 (4th Cir.2005), the court held that exclusion would not be appropriate there because there was no evidence in the record that the conduct complained of occurred frequently or even repeatedly.
In contrast, we have here abundant evidence that the violation at issue has occurred repeatedly and frequently, and that the government believes that its conduct is permissible, despite prior cautions by our court and others that military personnel, including NCIS agents, may not enforce the civilian laws. Accordingly, we find that the district court erred in denying Dreyer’s motion to suppress.[15]
CONCLUSION
For the reasons set forth above, we reverse the district court’s denial of Dreyer’s motion to suppress, and we remand to the district court for further proceedings consistent with this opinion.
REVERSED AND REMANDED.

. Dreyer challenges the admission of evidence related to RoundUp, arguing it did not meet the requirements for the admission of expert testimony established by Federal Rule of Evidence 702 and Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Because we conclude that suppression was warranted for other reasons, we do not reach this issue.

. RoundUp identified such files by comparing the "SHA-1 hash values” of files being offered for download—unique identifiers that do not change when a file name is altered— with values already known to be associated with child pornography.

. Dreyer had previously been a member of the Air Force.

. Officer Schrimpsher prepared the search warrant application. Officer Schrimpsher testified that he attached Agent Logan's report and supporting material to his affidavit. In drafting the affidavit, he copied and pasted large sections of Detective Polhemus’s sample. As a result, Officer Schrimpsher made a number of false representations in his affidavit.
Dreyer raises a Franks issue regarding the falsities in the affidavit. As we hold suppression was required on other grounds, we do not address this issue.

. We do not address Dreyer's contention that the on-site search of his computer exceeded the scope of the state warrant, as we conclude that suppression is appropriate for a different reason.

. The PCA states, "Whoever, except in cases and under circumstances expressly authorized by the Constitution or Act of Congress, willfully uses any part of the Army or the Air Force as a posse comitatus or otherwise to execute the laws shall be fined under this title or imprisoned not more than two years, or both.” 18 U.S.C. § 1385.

. "Posse comitatus (literally ‘power of the country’) was defined at common law as all those over the age of 15 upon whom a sheriff could call for assistance in preventing any type of civil disorder.” H.R.Rep. No. 97-71, pt. 2, at 4 (citing 1 William Blackstone, Commentaries 343-44). Although the PCA itself "was enacted during the Reconstruction Period to eliminate the direct active use of Federal troops by civil law authorities” to enforce the civil law, United States v. Banks, 539 F.2d 14, 16 (9th Cir.1976); see also United States v. Red Feather, 392 F.Supp. 916, 921-25 (D.S.D. 1975), it reflected long-standing American concerns about the use of the military to keep the civil peace, United States v. Walden, 490 F.2d 372, 375 (4th Cir.1974); see also The Declaration of Independence paras. 11, 12, 14 (U.S. 1776) (criticizing the King of Great Britain for having "kept among us, in times of peace, Standing Armies without the Consent *830 of our legislatures”; “affected to render the Military independent of and superior to the Civil power”; and "Quartering large bodies of armed troops among us”); 7 Cong. Rec. 3586 (1878) (remarks of Rep. William Kim-mel).

. After Agent Logan’s actions at issue in this appeal, on February 27, 2013, DoD issued Instruction No. 3025.21, which incorporated the substance of, and cancelled, Directive No. 5525.5. See DoD Instruction (DoDI) 3025.21(l)(c). Like the cancelled Directive, Instruction No. 3025.21 also provides, "By policy, Posse Comitatus Act restrictions (as well as other restrictions in this Instruction) are applicable to the Department of the Navy (including the Marine Corps) with such exceptions as the Secretary of Defense may authorize in advance on a case-by-case basis.” DoDI 3025.21, Enclosure 3(3). The other relevant provisions also remain materially unchanged, except as otherwise indicated later in this opinion.
In addition, on April 13, 2013, the Department of Defense issued a final rule promulgating regulations concerning the restriction on military support of civilian law enforcement. See Defense Support of Civilian Law Enforcement Agencies, 78 Fed.Reg. 21826-02 (codified at 32 C.F.R. § 182 (2013)). The rule was originally proposed on December 28, 2010. 75 Fed.Reg. 81547-01. The regulations as issued are largely identical to the DoD Instruction No. 3025.21.

. Although the most recent DoD Instruction and regulations were issued after the search at issue here, their content is largely identical to that contained in the earlier DoD Directive. Also, the Army policy implementing the newer Instruction and regulation is the same one that implemented the earlier Directive. So the DoD’s explanations of the intent and meaning of the newer documents is a useful aid into interpreting the earlier ones. Cf. Pipefitters Local Union No. 562 v. United States, 407 U.S. 385, 412, 92 S.Ct. 2247, 33 L.Ed.2d 11 (1972).

. Khan interpreted 32 C.F.R. § 213.10, a regulation that has since been withdrawn. See 58 Fed.Reg. 25,776 (Apr. 28, 1993). Hitchcock recognized that the withdrawn regulation's relevant provisions remained in DoD Directive 5525.5 as it was in effect at the time of the search at issue here. 286 F.3d at 1069-70 n. 8. Those same provisions are maintained in DoD Instruction No. 3025.21 and the new regulations. See 32 C.F.R. § 182.6; DoDI 3025.21, Enclosure 3.

. Because Agent Logan’s investigation itself violated the PCA-like restrictions, it is irrelevant whether it was permissible for him to transfer to civilian authorities "information collected during the normal course of military training or operations that may be relevant to a violation of any Federal or State law within the jurisdiction of such officials.” 10 U.S.C. § 371(a); see also DoD Directive 5525.5, Enclosure 2, E.2.1, Enclosure 4, E4.1.7.1; SEC-NAVINST 5820.7C(5); Hitchcock, 286 F.3d at 1069.

. We may properly take judicial notice of United States Census Bureau data, as such data "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.'' Fed.R.Evid. 201(b)(2); see United States v. Esquivel, 88 F.3d 722, 726-27 (9th Cir.1996); Skolnick v. Bd. of Comm’rs of Cook Cnty., 435 F.2d 361, 363 (7th Cir.1970).
The United States Census Bureau’s 2011 population estimate for the Seattle-Tacoma-Bellevue Metropolitan Statistical Area was about 3.5 million. See U.S. Census Bureau, Annual Estimates of the Population of Metropolitan and Micropolitan Statistical Areas: April 1, 2010 to July 1, 2012, available at http://www.census.gov/popes1/data/metro/ totals/2012/. The Census Bureau estimates that the total state population in that year was about 6.8 million people. See U.S. Census Bureau, Annual Estimates of the Population for the United States, Regions, States, and Puerto Rico: April 1, 2010 to July 1, 2013, available at http://www.census.gov/popes1/ data/index.html.
Census Bureau data also undermines any notion that Federal Way contains significantly more military personnel than other parts of the country. In 2011, the Census Bureau estimated that about 0.4% of Federal Way’s adult population was employed by the Armed Forces, the same percentage as it estimated for the United States population. See U.S. Census Bureau, 2011 American Community Survey.

. Similar connections to the military existed in the out-of-circuit cases upon which the government relies. In Hayes v. Hawes, 921 F.2d 100, 101-04 (7th Cir.1990), a Navy investigator assisted civilian police investigating drug trafficking in a mall across the street from a Naval base, after a sailor was found with drugs purchased at that mall. And United States v. Bacon, 851 F.2d 1312, 1313-14 (11th Cir. 1988), found no violation of the PCA where an army investigator assisted civilian law enforcement "to ferret out a source of some of the cocaine being supplied to both civilians and army personnel.”

. We note that in United States v. Holloway, 531 Fed.Appx. 582 (6th Cir.2013), an NCIS agent also carried out an online child pornography investigation that targeted a civilian. As there is no precedential circuit opinion in Holloway, see 6th Cir. R. 32.1(b); United States v. Utesch, 596 F.3d 302, 312 (6th Cir.2010), we do not discuss it further.

. We note that, contrary to the government's repeated representations in its brief and at oral argument that "to date, no court has excluded evidence gathered in violation of the Posse Comitatus Act,” at least two courts have done so. In State v. Pattioay, 78 Hawai'i 455, 896 P.2d 911, 925 (1995), the Hawaii Supreme Court deemed suppression necessary where "to ignore the violation ... would be to justify the illegality and condone the receipt and use of tainted evidence in the courts of this state.” And Taylor v. State, 645 P.2d 522, 524-25 (Okla.Crim.App.1982), suppressed evidence obtained in violation of the PCA because under the facts of that case, "the illegal conduct by the law enforcement personnel [rose] to an intolerable level as to necessitate an exclusion of the evidence resulting from the tainted arrest.”