**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA, *Plaintiff-Appellee*, | No. 13-30077 |
| v. | D.C. No. 2:12-cr-00119-MJP-1 |
| MICHAEL ALLAN DREYER, *Defendant-Appellant*. | OPINION |

Appeal from the United States District Court
for the Western District of Washington
Marsha J. Pechman, Chief District Judge, Presiding

Argued and Submitted En Banc
June 17, 2015— San Francisco, California

Filed November 4, 2015

Before: Sidney R. Thomas, Chief Judge, and Stephen
Reinhardt, Barry G. Silverman, Marsha S. Berzon,
Consuelo M. Callahan, Milan D. Smith, Jr., Mary H.
Murguia, Morgan Christen, Paul J. Watford, John B.
Owens and Michelle T. Friedland, Circuit Judges.

Opinion by Judge Christen;
Concurrence by Judge Berzon;
Concurrence by Judge Reinhardt;
Concurrence by Judge Owens;
Concurrence by Judge Silverman

## SUMMARY[*]

### Criminal Law

On issues arising from the Posse Comitatus Act (PCA), the en banc court affirmed the district court's denial of a suppression motion, and remanded to the three-judge panel for consideration of remaining issues, in a case in which the defendant was convicted of one count of distributing child pornography and one count of possessing child pornography.

A special agent of the Naval Criminal Investigative Service (NCIS) conducted an investigation into computers in Washington state sharing child pornography by utilizing a software query that encompassed the entire state but did not isolate or look for military service members. The investigation revealed that the defendant, a civilian, had shared child pornography files, and the NCIS passed that information along to the local police department.

The en banc court reaffirmed the holding in *United States v. Chon*, 210 F.3d 990 (9th Cir. 2000), that the NCIS and its civilian agents are subject to PCA-like restrictions proscribing direct assistance to civilian law enforcement.

The en banc court held that the NCIS agent's investigation violated PCA-like restrictions, where the agent set up the software to cast a net across the entire state of Washington, knowing the sweep would include countless devices that had no ties to the military and thus did not fall

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

within the jurisdiction of the Uniform Code of Military Justice. The en banc court could not conclude that the investigation had a legitimate independent military purpose because the methodology employed so clearly violated Department of Defense and naval policy, as well as the boundary Congress imposed through the PCA and 10 U.S.C. § 375. The en banc court observed that the agent's testimony illustrates that the violations likely resulted from institutional confusion about the scope and contours of the PCA and PCA-like restrictions.

The en banc court exercised its discretion to reach the issue of suppression, and concluded that on this record and at this juncture, the facts of the case do not demonstrate a need to deter future violations by suppressing the results of the investigation.

Concurring, Judge Berzon, joined by Judge Reinhardt, wrote separately to explain why she is comfortable with the holding that suppression is not warranted, although the panel opinion she authored held otherwise.

Concurring, Judge Reinhardt wrote that he is in complete agreement with both Judge Christen's and Judge Berzon's views.

Concurring in the judgment, Judge Owens, joined by Judges Silverman and Callahan, wrote that he believes that absent express congressional authorization, suppression is not a remedy for PCA violations.

Concurring in the judgment, Judge Silverman, joined by Judge Callahan, wrote that the agent did not violate the PCA-

like regulations, both because his assistance of civilian law enforcement was indirect and because his limited involvement had an independent military purpose.

## COUNSEL

Erik B. Levin (argued), Law Office of Erik B. Levin, Berkeley, California, for Defendant-Appellant.

Helen J. Brunner (argued), Marci Ellsworth, Assistant United States Attorneys; Scott A.C. Meisler, Criminal Division, Appellate Section, U.S. Department of Justice; Jenny A. Durkan, United States Attorney, and Annette L. Hayes, Acting United States Attorney, Western District of Washington, Seattle, Washington, for Plaintiff-Appellee.

Hanni Fakhoury and Jennifer Lynch, Electronic Frontier Foundation, San Francisco, California; Nancy L. Talner, T. Jared Friend, American Civil Liberties Union of Washington, Seattle, Washington; Venkat Balasubramani, Focal PLLC, Seattle, Washington; and David M. Porter, Co-Chair, National Association of Criminal Defense Lawyers Amici Curiae Committee, for amici curiae.

**OPINION**

CHRISTEN, Circuit Judge:

This case requires us to decide whether a Naval Criminal Investigative Service agent's involvement in civilian law enforcement constitutes a violation of the Posse Comitatus Act, and if so, whether that violation warrants excluding evidence obtained as a result of the involvement. We have no trouble concluding that the facts giving rise to the criminal charges in this case present clear violations of a congressional directive prohibiting the use of the military in civilian law enforcement. We decline to compel suppression because the facts of this case do not demonstrate that suppression is needed to deter future violations. We affirm the district court's denial of Dreyer's motion to suppress.[1]

**BACKGROUND**

Steve Logan is a special agent of the Naval Criminal Investigative Service ("NCIS"), "the investigative unit of the Navy." *See United States v. Chon*, 210 F.3d 990, 992 (9th Cir. 2000). He is a civilian employee stationed in Brunswick, Georgia. In 2010, Logan and two other NCIS agents initiated a criminal investigation of the distribution of child pornography on the Internet. They used RoundUp, a software

---

[1] In this opinion, we reach only the issues pertaining to the Posse Comitatus Act and the exclusionary rule. We remand the case to the original three-judge panel for consideration of the remaining issues. *See Kyocera Corp. v. Prudential-Bache Trade Servs., Inc.*, 341 F.3d 987, 995 (9th Cir. 2003) (en banc) ("If the Court votes to hear or rehear a case *en banc*, the *en banc* court may, in its discretion, choose to limit the issues it considers." (alteration omitted) (quoting *Summerlin v. Stewart*, 309 F.3d 1193, 1193 (9th Cir. 2002))).

investigative tool that monitors online distribution of known child pornography files around the world.

RoundUp was developed for the Internet Crimes Against Children Task Force. The task force comprises federal, state, and local law enforcement officers investigating internet crimes against children, including distribution of child pornography. RoundUp software is not commercially available because it was designed to be used almost exclusively by task force members. It uses a database of known child pornography files compiled by the National Center for Missing and Exploited Children. To ascertain the presence of such files, RoundUp relies on unique file identifiers called SHA-1 hash values, which are essentially "digital fingerprint[s]" associated with electronic media. SHA-1 hash values remain unchanged as long as the file itself is not altered. RoundUp searches for these identifiers on peer-to-peer file-sharing networks, where individuals upload documents and media to share with others. Uploaded images are publicly available to all users of the file-sharing network.

In 2011, NCIS agents in Washington state asked Logan to investigate computers in Washington sharing child pornography. Logan agreed and used RoundUp to search Gnutella, a peer-to-peer file-sharing network. The RoundUp query encompassed the entire state of Washington. Logan later testified that RoundUp cannot "isolate and look for military service members" because it has only geographic parameters. The software detected a computer at Internet Protocol ("IP") address 67.160.77.21 that had shared several files identified as child pornography. Logan downloaded two images and a video from the IP address and verified that they depicted child pornography.

Logan contacted NCIS's representative at the National Center for Missing and Exploited Children and requested an administrative subpoena for the name and physical address associated with the IP address. The form required a "Reason for Subpoena," where Logan wrote: "Suspect IP was identified in area of large [Department of Defense] and [U.S. Navy] saturation indicating likelihood of USN/DOD suspect." The Center forwarded the request to the FBI, and the FBI sent an administrative subpoena to Comcast. Comcast identified Michael Dreyer of Algona, Washington, as the person associated with the subject IP address.

When Logan learned through a background check that Dreyer had no present military affiliation, he prepared a report of his investigation and sent all relevant materials to an NCIS agent in Washington.[2] That agent passed the information along to the Algona Police Department in May 2011, and the police department obtained a search warrant from a state court.

On July 6, 2011, local police officers executed the warrant on Dreyer's residence, where an examination of Dreyer's computer revealed several images and videos of child pornography. The officers arrested Dreyer and seized his computer and several other digital devices. Dreyer was charged with six counts of possessing depictions of minors engaged in sexually explicit conduct in violation of Revised Code of Washington 9.68A.070.

---

[2] Although one of the concurrences states that Logan promptly ended military involvement when he discovered that Dreyer was a civilian, the record is clear that he turned his investigative results over to NCIS agents in Washington, not civilian authorities.

In December 2011, a special agent of the United States Department of Homeland Security obtained a federal warrant to search Dreyer's computer and other devices. A subsequent search of the computer yielded 21 videos and over 1,300 images of child pornography. Dreyer was charged with one count of distributing child pornography in violation of 18 U.S.C. § 2252(a) and (b)(1), and one count of possessing child pornography in violation of 18 U.S.C. § 2252(a)(4)(B) and (b)(2).

In the federal case, Dreyer moved to suppress the evidence seized pursuant to both the state and federal warrants. Among other claims, Dreyer argued that Logan's search violated the Posse Comitatus Act, which generally prohibits use of the military to conduct civilian law enforcement activities. *See* 18 U.S.C. § 1385. The district court ruled it was not "unusual or inappropriate for NCIS to make a referral to [its] counterparts" and denied Dreyer's motion.

Dreyer was convicted of both federal charges after a four-day jury trial. He was sentenced to 216 months' incarceration and lifetime supervised release. After Dreyer timely appealed, a divided three-judge panel of this court reversed and remanded. *United States v. Dreyer*, 767 F.3d 826, 837 (9th Cir. 2014).

The panel held that Logan's actions violated restrictions imposed pursuant to the Posse Comitatus Act ("PCA"), *id.* at 829–35, 838–39, and that the district court erred by failing to suppress the evidence seized as a result of NCIS's investigation, *id.* at 837. The dissent argued that the exclusionary rule is an extraordinary remedy that is

unwarranted in this case. *Id.* at 838–42 (O'Scannlain, J., dissenting).

A majority of the active judges of our court voted to rehear this case en banc to reconsider the important issues it presents. *United States v. Dreyer*, 782 F.3d 416, 417 (9th Cir. 2015). We have jurisdiction pursuant to 28 U.S.C. § 1291.

## STANDARD OF REVIEW

"A district court's grant or denial of a motion to suppress is reviewed de novo." *United States v. Maddox*, 614 F.3d 1046, 1048 (9th Cir. 2010). We also review de novo the question whether the PCA was violated because it is a mixed question of fact and law that is primarily legal. *United States v. Hitchcock*, 286 F.3d 1064, 1069 (9th Cir.), *as amended by* 298 F.3d 1021 (9th Cir. 2002).

## DISCUSSION

## I. **PCA-like restrictions apply to NCIS and its civilian agents**.

"Posse comitatus (literally 'power of the country') was defined at common law as all those over the age of 15 upon whom a sheriff could call for assistance in preventing any type of civil disorder." *See* H.R. Rep. No. 97-71, pt. 2, at 4 (1981) (citing 1 William Blackstone, Commentaries 343–44). In 1878, Congress codified a prohibition on the use of the military in civilian law enforcement activities by enacting the PCA. *See* Act of June 18, 1878, ch. 263, 20 Stat. 152 (1878) (current version at 18 U.S.C. § 1385). The current version of the Act provides:

> Whoever, except in cases and under circumstances expressly authorized by the Constitution or Act of Congress, willfully uses any part of the Army or the Air Force as a posse comitatus or otherwise to execute the laws shall be fined under this title or imprisoned not more than two years, or both.

18 U.S.C. § 1385. The statute "eliminate[s] the direct active use of Federal troops by civil law authorities," *United States v. Banks*, 539 F.2d 14, 16 (9th Cir. 1976), and "prohibits Army and Air Force military personnel from participating in civilian law enforcement activities," *Chon*, 210 F.3d at 993. Writing on behalf of the Supreme Court, Chief Justice Burger considered Army surveillance of civilian affairs and described "a traditional and strong resistance of Americans to any military intrusion into civilian affairs" that "has deep roots in our history and found early expression, for example, in the Third Amendment's explicit prohibition against quartering soldiers in private homes without consent and in the constitutional provisions for civilian control of the military." *Laird v. Tatum*, 408 U.S. 1, 15 (1972). As in *Laird*, "[t]hose prohibitions are not directly presented by this case, but their philosophical underpinnings explain our traditional insistence on limitations on military operations in peacetime" and our historical concern that "unlawful activities of the military [c]ould go unnoticed or unremedied." *Id.* at 15–16.

In 1981, Congress enacted a separate statute directing:

> The Secretary of Defense shall prescribe such regulations as may be necessary to ensure that any activity (including the provision of any

> equipment or facility or the assignment or detail of any personnel) . . . does not include or permit direct participation by a member of the Army, Navy, Air Force, or Marine Corps in a search, seizure, arrest, or other similar activity unless participation in such activity by such member is otherwise authorized by law.

10 U.S.C. § 375.[3]  In consideration of this provision, we have held that "[a]lthough the PCA does not directly reference the Navy or Marine Corps," Congress prohibits "Navy involvement in enforcing civilian laws."  *Chon*, 210 F.3d at 993.  Pursuant to § 375, the Secretary of Defense issued regulations in 1982 that provided, in part:

> [T]he prohibition on use of military personnel "as a posse comitatus or otherwise to execute the laws" prohibits the following forms of direct assistance:
>
> > (i) Interdiction of a vehicle, vessel, aircraft or other similar activity.
> >
> > (ii) A search or seizure.
> >
> > (iii) An arrest, stop and frisk, or similar activity.
> >
> > (iv) Use of military personnel for surveillance or pursuit of individuals, or

---

[3]  There are certain exceptions to § 375, but they are not at issue in this case.  *See* 10 U.S.C. §§ 372–374, 379–382.

as informants, undercover agents, investigators, or interrogators.

32 C.F.R. § 213.10(a)(3) (1982). In 1986, the Department of Defense ("DoD") issued a policy containing substantially identical content and stating that "guidance on the Posse Comitatus Act . . . is applicable to the Department of the Navy and the Marine Corps as a matter of DoD policy." DoD Directive ("DoDD") 5525.5 § E4.3 (Jan. 15, 1986). "[T]he Secretary of the Navy, using nearly identical language, has adopted this policy." *Chon*, 210 F.3d at 993 (citing former Secretary of the Navy Instructions (SECNAVINST) 5820.7B (Mar. 28, 1998)); *see also* SECNAVINST 5820.7C (Jan. 26, 2006) (current policy containing similar content).

In 1993, the Secretary of Defense removed 32 C.F.R. part 213, stating that the regulations had "served the purpose for which they were intended and are no longer valid." Removal of Parts, 58 Fed. Reg. 25,776-01 (Apr. 28, 1993). Though the congressional directive in 10 U.S.C. § 375 is unambiguous, no regulations were in place for some 20 years. In April 2013, regulations under § 375 were reissued with content substantively similar to the regulations that had previously been in place. *See* 32 C.F.R. § 182.6 (2013). *Compare* 32 C.F.R. § 213.10(a)(3) (1982) ("Restrictions on direct assistance."), *with* 32 C.F.R. § 182.6(a)(1)(iii) (2013) ("Restrictions on Direct Assistance.").

In *United States v. Chon*, our court considered a PCA challenge to NCIS's involvement in the investigation of theft of military property. 210 F.3d at 991–93. We held that the "PCA-like restrictions" adopted pursuant to § 375 apply to the Navy and NCIS, but we concluded that the investigation in *Chon* was permissible because "it was undertaken for the

independent military purpose of recovering military equipment." *Id.* at 993–94. As here, the investigation in *Chon* took place when there was no enabling regulation specifically prohibiting direct participation by a member of the Navy in civilian law enforcement. *Id.* at 992–93. Nevertheless, § 375 and the DoD and naval policies were intact at all relevant times, and *Chon* relied on these provisions when it held that PCA-like restrictions apply to NCIS and its civilian agents. *Id.* at 993–94. We reached the same conclusion in *United States v. Hitchcock*, where we held that the Navy and NCIS are bound by the PCA-like restrictions mandated by § 375. 286 F.3d at 1069–70.**[4]**

The Government argues that PCA-like restrictions do not apply to NCIS or its agents because NCIS is a civilian law enforcement agency with no direct reporting relationship to a military officer. *Chon* rejected these arguments, holding that "NCIS is bound by the limitations of § 375." 210 F.3d at 994. *Chon* explained that DoD and naval policies:

> exempt four categories of people from PCA-like restrictions: (1) members of reserve components when not on active duty; (2) members of the National Guard when not in the Federal Service; (3) civilian employees of DoD unless under the direct command and control of a military officer; and (4) military

---

**[4]** *Hitchcock* explained that 32 C.F.R. § 213.10 (1982) was merely "a prior version of DoD Directive 5525.5," and observed that PCA-like restrictions "remain controlling" despite the absence of regulations. *Hitchcock*, 286 F.3d at 1069–70 & n.8; *see also United States v. Khan*, 35 F.3d 426, 431 (9th Cir. 1994) ("[T]he Posse Comitatus Act applies to the Navy through [10 U.S.C. §] 375 and 32 C.F.R. § 213.10 [(1982)].").

service members when off duty and in a private capacity.

*Id.* at 993. We interpreted "these exemptions to mean that the PCA and PCA-like restrictions function to proscribe use of the strength and authority of the military rather than use of the private force of the individuals who make up the institution." *Id.* We specifically held that PCA-like restrictions do apply to "civilian NCIS agents [who] represent[] and further[] the interests of the Navy," and whom civilians are unable to distinguish from military agents. *Id.* We reached this result relying on § 375 and DoD and naval policy. *Id.* at 993–94. We see no need to depart from *Chon*'s analysis in Dreyer's case. *See* 10 U.S.C. § 375; SECNAVINST 5820.7C(8)(e)(1)–(4); DoDD 5525.5 § E4.2.

The Government correctly points out that the reporting relationship between NCIS and the Navy has changed since *Chon* was decided, but that change does not affect the outcome of Dreyer's case because NCIS continues to "report[] directly" to the Navy. *See* SECNAVINST 5430.107(5)(a) (Dec. 28, 2005). The Navy's current policies also require that a Board of Directors oversee NCIS strategy and operations and facilitate the Navy's "corporate governance" of NCIS. *See* SECNAVINST 5430.107(5)(c). The Board includes military officers such as the Vice Chief of Naval Operations and the Assistant Commandant of the Marine Corps. *Id.* This structure leaves no doubt about the existence of a reporting relationship between NCIS and military officers. In short, nothing in the current policies undermines *Chon*'s rejection of the same argument the Government asserts here.

New DoD regulations comport with the conclusion that PCA-like restrictions apply to NCIS. Although these regulations were issued after NCIS conducted the subject investigation, they are notable because they are an agency interpretation of a statutory provision that has remained unchanged. *Cf. Pipefitters Local Union No. 562 v. United States*, 407 U.S. 385, 411–12 (1972) (considering later legislation in interpretation of earlier enactment). The regulations define "DoD personnel" as "Federal military officers and enlisted personnel and *civilian employees* of the Department of Defense." 32 C.F.R. § 182.3 (emphasis added). They state that "DoD personnel are prohibited from providing [specified] forms of direct civilian law enforcement assistance," including "search or seizure"; "[e]vidence collection"; "[s]urveillance . . . of individuals [or] items, . . . or acting as undercover agents, informants, [or] investigators"; and "[f]orensic investigations or other testing of evidence obtained from a suspect for use in a civilian law enforcement investigation in the United States unless there is a DoD nexus." 32 C.F.R. § 182.6(a)(1)(iii)(A). The new regulations expressly "[a]ppl[y] to civilian employees of the DoD Components," and "to all actions of DoD personnel worldwide." 32 C.F.R. §§ 182.2(e), 182.4(c). The Secretary of Defense instituted these regulations under express congressional delegation, *see* 10 U.S.C. § 375, and they unambiguously interpret PCA-like restrictions to apply to civilian employees of DoD.

We reaffirm *Chon*'s holding that NCIS and its civilian agents are subject to PCA-like restrictions proscribing direct assistance to civilian law enforcement. *See Chon*, 210 F.3d at 994. Congress did not make voluntary its requirement that the Secretary of Defense establish regulations prohibiting military involvement in civilian law enforcement, and NCIS

was subject to these restrictions when it undertook its investigation of Dreyer.

## II.  The violations in this case were systemic, but likely the result of institutional confusion that existed at the time.

### A. Logan's investigation violated PCA-like restrictions.

PCA-like restrictions prohibit direct military involvement in civilian law enforcement activities, but they permit some indirect assistance, such as involvement that arises "during the normal course of military operations or other actions that 'do not subject civilians to the use of military power that is regulatory, prescriptive, or compulsory.'" *Hitchcock*, 286 F.3d at 1069 (alterations omitted) (quoting DoDD 5525.5 § E4.1.7.2).  Permissible indirect assistance "must not 'constitute the exercise of regulatory, proscriptive, or compulsory military power,' must not 'amount to direct active involvement in the execution of the laws,' and must not 'pervade the activities of civilian authorities.'" *United States v. Khan*, 35 F.3d 426, 431 (9th Cir. 1994) (quoting *United States v. Yunis*, 924 F.2d 1086, 1094 (D.C. Cir. 1991)).  "If any one of these tests is met, the assistance is not indirect." *Id.*

The Government argues that NCIS's involvement in the Washington investigation constituted permissible indirect assistance because NCIS merely transferred information to civilian law enforcement.  Not so.  In contrast to cases where military personnel offered only subsidiary support, Logan's investigation in this case pervaded the actions of civilian law enforcement. *Cf. United States v. Klimavicius-Viloria*, 144

F.3d 1249, 1259 (9th Cir. 1998) (no violation where the Navy merely supplied equipment, logistical support, and backup security); *Khan*, 35 F.3d at 431–32 (same). Logan testified that he and two other NCIS agents initiated an operation to search for individuals sharing child pornography online. His report on the Washington investigation formed the basis of the state warrant to search Dreyer's home, and execution of that warrant yielded the evidence that led to the charges against Dreyer. Logan testified that he was not engaged in "surveillance," which he described as "watching." He explained that he was instead conducting an "investigation," an activity he described as "active." This conduct is expressly prohibited as direct assistance. *See* DoDD 5525.5 § E4.1.3.4 (identifying under "[r]estrictions on [d]irect [a]ssistance" the "[u]se of military personnel for surveillance or pursuit of individuals, or as undercover agents, informants, investigators, or interrogators"); *see also United States v. Red Feather*, 392 F. Supp. 916, 925 (D.S.D. 1975) ("Activities which constitute an active role in direct law enforcement [include] investigation of a crime . . . .").

We have recognized that PCA-like restrictions allow "an exception to the general prohibition on direct involvement where the military participation is undertaken 'for the primary purpose of furthering a military or foreign affairs function of the United States, regardless of incidental benefits to civilian authorities.'" *Hitchcock*, 286 F.3d at 1069 (quoting DoDD 5525.5 § E4.1.2.1). This exception includes, for example, "investigations and other actions related to enforcement of the Uniform Code of Military Justice." *Id.* at 1070 (alteration omitted) (quoting DoDD 5525.5 § E4.1.2.1.1). Courts have regularly construed that code to prohibit members of the armed forces from possessing child pornography. *See, e.g.*, *United States v. Stoltz*, 720 F.3d

1127, 1130 (9th Cir. 2013); *United States v. Brown*, 529 F.3d 1260, 1262 (10th Cir. 2008); *United States v. Allen*, 53 M.J. 402, 407 (C.A.A.F. 2000). Properly executed, investigations of possession or distribution of child pornography by military personnel could be excepted from PCA-like restrictions.

Logan did not undertake such an investigation. Instead, he used RoundUp to conduct a statewide audit of all computers engaged in file sharing. Logan represented to the FBI that he sought an administrative subpoena "*in [an] area of large DOD and USN saturation* indicating likelihood of USN/DOD suspect" (emphasis added), but the computer query employed in this case was in no way limited to members of the military. *See* 10 U.S.C. § 802 (identifying persons subject to the UCMJ). To the contrary, Logan later testified that he had been "monitoring any computer IP address within a specific geographic location . . . not specific to US military only, or US government computers," and that it was his "standard practice[] to monitor all computers in a geographic area." Here, Logan set RoundUp to cast a net across the entire state of Washington, knowing the sweep would include countless devices that had no ties to the military and thus did not fall under the jurisdiction of the Uniform Code of Military Justice. The investigation in this case was not reasonably tied to military bases, military facilities, military personnel, or military equipment. *Cf. Hitchcock*, 286 F.3d at 1070 (applying exception where NCIS agent investigated the use and distribution of LSD on a military base); *Chon*, 210 F.3d at 994 (applying exception where NCIS agents investigated theft of military equipment from a naval facility).

Logan and the NCIS agents who worked with him spearheaded a law enforcement investigation that would

inevitably encompass *mostly* civilian-owned computers. We cannot conclude that the investigation had a legitimate independent military purpose because the methodology NCIS employed so clearly violated DoD and naval policy, as well as the boundary Congress imposed through the PCA and § 375.

**B. The violations in this case likely resulted from institutional error.**

Logan's testimony illustrates that the violations in this case likely resulted from institutional confusion about the scope and contours of the PCA and PCA-like restrictions. On the incomplete record available, we cannot tell whether Logan's practices were as widespread as Dreyer argues they were, but it is certain that the NCIS activity in this case was not an isolated incident. Logan and two other NCIS agents initiated their child pornography investigative operation in 2010. The operation involved at least three agents and had been underway for 19 months at the time of the trial in this case. Logan testified in another federal proceeding that "th[e] operation was cleared all the way through NCIS headquarters back in 2010." *See* Transcript of Supplemental Motion to Suppress Evidence (Transcript) at 75, *United States v. Gentles*, No. 1:12-cr-120 (E.D. Mo. Oct. 16, 2014), ECF No. 112; *see also Rosales-Martinez v. Palmer*, 753 F.3d 890, 894 (9th Cir. 2014) ("It is well established that we may take judicial notice of judicial proceedings in other courts.").

Logan also testified that his duties as an NCIS agent were "[t]o investigate any federal, U.S. federal crimes, or crimes against the Uniform Code of Military Justice." He also claimed he had authority to investigate "[p]ossession and distribution of child pornography across the [I]nternet"

because it is "a federal crime" and NCIS agents "are credentialed U.S. federal agents." Notably, at one point Logan specifically disavowed that his investigative authority was limited:

> Q. . . . [Y]ou are limited in the areas that you can investigate, wouldn't that be correct?
>
> A.  No, sir, that would not be correct.

Contrary to the suggestion in one of the concurrences, Logan at no point testified that he limited his investigations to military personnel, and the foregoing testimony indicates that he did not believe his authority to be limited to military personnel.

Indeed, Logan explained that he had a standard practice of "monitor[ing] all computers in a [certain] geographic area" without regard to military status. Yet RoundUp's geographic accuracy is limited to "a 25- to 30-mile radius." We recognize that because some military bases are in remote areas, it might be possible to fashion a targeted RoundUp inquiry that would encompass only an insignificant number of civilian-owned computers. The record does not tell us whether the scope of the other NCIS investigations Logan described went beyond geographic areas that legitimately could be expected to include high concentrations of military personnel. What is clear is that the investigation in Dreyer's case resulted from an investigative technique that NCIS did not consider to be out of bounds. To the contrary, Logan testified that after the three-judge panel of this court issued its opinion unanimously finding that his conduct violated PCA-like restrictions, NCIS put "[a]bsolutely no[]" restrictions on him. *See* Transcript at 75, *Gentles*, No. 1:12-cr-120 (E.D.

Mo. Oct. 16, 2014), ECF No. 112. NCIS's misunderstanding about the contours of the PCA and PCA-like restrictions is further evident in the Government's emphatic assertion before the district court and the three-judge panel that Logan's actions were permissible.

At best, the record demonstrates a poor understanding of the restrictions imposed on NCIS's involvement in civilian law enforcement. Authorization of the program described in Logan's testimony was apparently based on an entirely incorrect understanding of the PCA-like restrictions that apply to NCIS.

III.   **Although this case presents troubling violations, we do not order suppression.**

A. **We exercise our discretion to reach the issue of suppression.**

The Government argues in its supplemental brief that suppression is never warranted for PCA violations that do not implicate constitutional violations. Dreyer strenuously counters that the Government waived this argument by failing to raise it before filing its petition for panel rehearing. Dreyer is correct that the Government did not raise this argument in the district court, or even when the case was originally briefed and argued on appeal. The three-judge panel that originally heard this case unanimously held that PCA-like restrictions apply to NCIS and that the conduct in this case violated those restrictions. *Dreyer*, 767 F.3d at 829–35, 838–39. One member of the panel concluded exclusion was not warranted. *Id.* at 838–42 (O'Scannlain, J., dissenting).

Generally, an appellee waives any argument it fails to raise in its answering brief. *See Clem v. Lomeli*, 566 F.3d 1177, 1182 (9th Cir. 2009). But "the rule of waiver is a discretionary one," *Ruiz v. Affinity Logistics Corp.*, 667 F.3d 1318, 1322 (9th Cir. 2012) (quoting *Ackerman v. W. Elec. Co.*, 860 F.2d 1514, 1517 (9th Cir. 1988)), and we can "make an exception to waiver . . . in the exceptional case in which review is necessary to prevent a miscarriage of justice or to preserve the integrity of the judicial process," *id.* (quoting *Bolker v. C.I.R.*, 760 F.2d 1039, 1042 (9th Cir. 1985)). Here, we exercise our discretion to consider whether suppression is warranted because, under the unique facts of this case, doing so best serves the integrity of the judicial process.[5] Our decision to do so is informed in part by our conclusion that the important issues in this case will reoccur until they are addressed by the court.

## B. The facts of this case do not demonstrate that suppression is needed to deter future violations.

"Suppression of evidence . . . has always been our last resort, not our first impulse." *Hudson v. Michigan*, 547 U.S. 586, 591 (2006). Courts do not invoke the exclusionary rule absent compelling circumstances:

> The exclusionary rule generates substantial social costs, which sometimes include setting the guilty free and the dangerous at large. We have therefore been cautious against

---

[5] Dreyer had the opportunity to present his arguments on the suppression issue in supplemental briefing. *See Alcaraz v. I.N.S.*, 384 F.3d 1150, 1161 (9th Cir. 2004) (no prejudice where party presents relevant arguments in supplemental briefing).

> expanding it, and have repeatedly emphasized that the rule's costly toll upon truth-seeking and law enforcement objectives presents a high obstacle for those urging its application.

*Id*. (alterations and citations omitted); *see also Sanchez-Llamas v. Oregon*, 548 U.S. 331, 347 (2006) ("[T]he exclusionary rule is not a remedy we apply lightly."). One of the concurrences cites *Davis v. United States*, 131 S. Ct. 2419, 2427 (2011), in support of its suggestion that the Supreme Court has, in recent years, made more stringent the test for invoking the exclusionary rule. But *Davis* is entirely consistent with *Hudson* and *Sanchez-Llamas*, and we recognize that all three cases reflect the Supreme Court's recent direction that the rule is a remedy of last resort that is warranted only when "the deterrence benefits . . . outweigh [the] heavy costs." *Id.* at 2427.

In its recent decisions, the Supreme Court has not held that suppression is never available for certain violations; rather, it explained that the exclusionary rule is applied "*primarily* to deter constitutional violations" and violations of statutes that enforce constitutional norms. *Sanchez-Llamas*, 548 U.S. at 348 (emphasis added); *see also United States v. Harrington*, 681 F.2d 612, 615 (9th Cir. 1982) ("There must be an exceptional reason, typically the protection of a constitutional right, to invoke the exclusionary rule."). Notably, Dreyer does not argue that NCIS violated his Fourth Amendment rights.[6]

---

[6] Dreyer voluntarily placed pornographic images on a peer-to-peer file-sharing network, granting members of the public free access to them. Under our Fourth Amendment jurisprudence, accessing files made available through file-sharing software does not constitute a search.

The exclusionary rule is certainly available for violations of constitutional rights, but the Supreme Court has approved of using the rule to remedy statutory violations only in rare circumstances. *See Miller v. United States*, 357 U.S. 301, 313–14 (1958) (requiring suppression of evidence uncovered in search incident to unlawful arrest); *McNabb v. United States*, 318 U.S. 332, 344–45 (1943) (invoking suppression for violation of statutory right intended to ward against "all the evil implications of secret interrogation," a concern rooted in the Fifth Amendment). Apart from the Fourth and Fifth Amendment concerns regarding unlawful searches and interrogations, the Supreme Court has not specifically identified "statutory violations that enforce constitutional norms," nor has it described the degree of constitutional nexus required to invoke suppression for a statutory violation. *See, e.g.*, *Sanchez-Llamas*, 548 U.S. at 348 ("The few cases in which we have suppressed evidence for statutory violations . . . arose directly out of statutory violations that implicated important Fourth and Fifth Amendment interests."). The PCA does have constitutional underpinnings,[7] however, and

---

*United States v. Ganoe*, 538 F.3d 1117, 1127 (9th Cir. 2008) (no objectively reasonable expectation of privacy in files shared through file-sharing software). We have said that when an individual uses a file-sharing software, he "open[s] his computer to anyone else with the same freely available program," thereby "open[ing] up his download folder to the world." *Id.*

[7]  The Supreme Court has recognized that "concerns [about] Army surveillance activities . . . reflect a traditional and strong resistance of Americans to any military intrusion into civilian affairs[,] [which] found early expression . . . in the Third Amendment[]." *Laird*, 408 U.S. at 15; *see also United States v. Walden*, 490 F.2d 372, 375 (4th Cir. 1974) ("[T]he [PCA] was no more than an expression of constitutional limitations on the use of the military to enforce civil laws."); 7 Cong. Rec. 4247 (1878) (remarks of Sen. Benjamin Hill) (use of military power to

we know of no controlling precedent precluding application of the exclusionary rule for a violation of the PCA or § 375 in a case in which exclusion is otherwise warranted. *See, e.g.*, *United States v. Roberts*, 779 F.2d 565, 568 (9th Cir. 1986), *superseded by statute on other grounds as recognized in Khan*, 35 F.3d at 432 n.7.

*Chon* squarely held that PCA-like restrictions adopted pursuant to § 375 apply to NCIS, but we have not addressed whether the exclusionary rule is the appropriate remedy for this type of violation since our decision in *Roberts*. *Roberts* concerned a joint effort between the Navy and the Coast Guard to enforce drug smuggling laws. 779 F.2d at 566. Coast Guard personnel aboard a Navy frigate noticed a sailboat, announced their intention to board it, and dispatched a Coast Guard team on a Navy boarding boat with a Navy crew. *Id.* Once aboard the sailboat, the Coast Guard discovered bales of marijuana. *Id.* The sailboat crew members argued that the marijuana should be suppressed because the Navy's involvement in the operation violated the PCA. *Id.* at 566–67.

We concluded that the Navy violated 10 U.S.C. § 374, which "generally requires that [Navy] equipment be used only 'for monitoring and communicating the movement of air and sea traffic,'" *id.* at 567 (quoting 10 U.S.C. § 374(b)), and that the Navy violated the "general policy" against "direct assistance to the Coast Guard" under the PCA, *id.* at 567–68. We declined to compel suppression in *Roberts* because "the Navy's violation [of PCA-like restrictions] was unintentional and in good faith[,] . . . the clear costs of applying an

discharge duties of civil officers supplants "a government for liberty . . . founded in the consent of the people" with "a government of force").

exclusionary rule [we]re not countervailed by any discernible benefits," and invoking the rule was inappropriate until there was a showing of "widespread and repeated violations" *and* a need for the remedy. *Id.* at 568 (quoting *United States v. Wolffs*, 594 F.2d 77, 85 (5th Cir. 1979)). *Roberts* is entirely consistent with the Supreme Court's instruction that the exclusionary rule should be applied "only where its remedial objectives are thought most efficaciously served—that is, where its deterrence benefits outweigh its substantial social costs." *See Hudson*, 547 U.S. at 591 (citations omitted). We affirm our holding in *Roberts* that "an exclusionary rule should not be applied to violations of 10 U.S.C. §§ 371–378 until a need to deter future violations is demonstrated." 779 F.2d at 568.

RoundUp, file sharing, and related search technology did not exist when *Roberts* was decided. Although precedent from several of our sister circuits mirrors the *Roberts* rule that suppression may be appropriate for "widespread and repeated violations" of PCA-like restrictions, those courts either have not considered the use of similar search technology in the context of the PCA, or they have not encountered violations that are so "widespread and repeated" that they demonstrate the need for deterrence. *See, e.g.*, *United States v. Johnson*, 410 F.3d 137, 149 (4th Cir. 2005); *Hayes v. Hawes*, 921 F.2d 100, 104 (7th Cir. 1990); *United States v. Bacon*, 851 F.2d 1312, 1313–14 (11th Cir. 1988) (per curiam); *Wolffs*, 594 F.2d at 85; *United States v. Walden*, 490 F.2d 372, 377 (4th Cir. 1974).

The facts of this case are troubling and unprecedented in our case law, but they also point to institutional confusion and show that NCIS misunderstood the scope of its authority. Logan testified there were no limitations on his authority, but

he also testified that NCIS agents "are charged with and mandated to conduct any criminal investigations *as it relates to the Department of the Navy* or its assets, its facilities or its personnel, to include *areas in close proximity* to the Department of Navy facilities." (Emphasis added.)

Further, contrary to Logan's testimony that his investigative operation was approved by "NCIS headquarters" and that his supervisors took no actions to curb his activities after a three-judge panel of our court issued its decision, the Government represented at oral argument that the military is already in the process of changing its practices and limiting its participation in civilian law enforcement to conform to PCA-like restrictions. In its supplemental briefing and at oral argument, the Government strenuously argued that "th[is] [c]ourt's finding of a violation is more than sufficient to deter NCIS agents from engaging in any future investigative efforts of this type." Moreover, after Logan's investigation of Dreyer, DoD adopted new regulations that acknowledge the applicability of PCA-like restrictions to the Navy and to NCIS. *See* 32 C.F.R. pt. 182.

NCIS must conform its investigatory practices to the law, but we are persuaded that the Government should have the opportunity to self-correct before we resort to the exclusionary rule, particularly because it has already acknowledged the need to do so. Unlike cases in which courts compel suppression to correct violations committed by law enforcement agencies, *see, e.g.*, *United States v. Sears*, 411 F.3d 1124, 1125 (9th Cir. 2005) (affirming suppression of evidence seized by local law enforcement agents pursuant to unreviewed portions of search warrant), this case arises from violations that took place under the purview of the military, which is unique in its command structure and its

relationship to the other branches of government. Invoking the exclusionary rule in this case would do little to redress an ongoing investigative operation that appears to be the product of institutional error somewhere in the military's command structure, rather than intentional disregard of a statutory constraint. *See Hudson*, 547 U.S. at 593 (noting exclusion may not be justified when "the interest protected by the constitutional guarantee that has been violated would not be served by suppression of the evidence obtained"); *United States v. Payner*, 447 U.S. 727, 733 n.5 (1980) ("We cannot assume that similar lawless conduct, if brought to the attention of responsible officials, would not be dealt with appropriately.").

To be clear, we do not suggest that the exclusionary rule might be inapplicable for a constitutional violation merely because government actors who committed the violation do not understand the legal prohibition. In the more common Fourth or Fifth Amendment context, institutional confusion or ignorance is not a ground for refusing to exclude evidence. *See, e.g.*, *United States v. Negrete-Gonzales*, 966 F.2d 1277, 1283 (9th Cir. 1992) ("Fundamental errors . . . that result in clear constitutional violations . . . require suppression, unless the officers can show objective good faith reliance . . . ." (citing Fed. R. Crim. P. 41; *United States v. Freitas*, 856 F.2d 1425, 1433 (9th Cir. 1988); *United States v. Luk*, 859 F.2d 667, 671 (9th Cir. 1988)). As explained, the scenario presented by this case is both extreme and unusual.

The military is best suited to correct this systemic violation, and it has initiated steps to do so. Therefore, on this record and at this juncture, we conclude that the facts of this case do not demonstrate "a need to deter future violations" by suppressing the results of Logan's

investigation.  *See Roberts*, 779 F.2d at 568.  We affirm the district court's order denying Dreyer's motion to suppress.

## CONCLUSION

On the issues arising from the Posse Comitatus Act, we affirm the district court's denial of Dreyer's motion to suppress.

## AFFIRMED IN PART, REMANDED IN PART.

BERZON, Circuit Judge, joined by REINHARDT, Circuit Judge, concurring:

I join fully in the majority opinion.  I write separately to explain why I am comfortable with the holding that suppression is not warranted, although the panel opinion I authored held otherwise.  *See United States v. Dreyer*, 767 F.3d 826, 835–37 (9th Cir. 2014).

As a preliminary matter, when the case was before our three-judge panel, the United States never contested that the exclusionary rule *could* apply to widespread and repeated violations of the PCA.  The United States did not make this argument for good reason.  *Roberts* held to the contrary, stating that the exclusionary rule can be "applied to violations of 10 U.S.C. §§ 371–78 [if] a need to deter future violations is demonstrated," but should not be applied where there is no such showing.  779 F.2d at 568; *see also United States v. Johnson*, 410 F.3d 137, 149 (4th Cir. 2005); *Hayes v. Hawes*, 921 F.2d 100, 104 (7th Cir. 1990); *United States v. Wolffs*, 594 F.2d 77, 85 (5th Cir. 1979).

Addressing, now, the availability of suppression as a remedy for violations of the PCA (and PCA-like restrictions), I emphasize that the PCA is deeply grounded in constitutional principles. The United States' interest in checking military encroachments into civilian affairs finds expression in the earliest founding documents. *See* Charles Doyle, Cong. Research Serv., 95-964 S, The Posse Comitatus Act and Related Matters: The Use of the Military to Execute Civilian Law 1–6 (2000). When the colonists set out to win independence from King George, their resentment of the Crown's use of troops to enforce customs laws and maintenance of standing armies became a rallying cry. *See* H.R. Rep. No. 97-71, pt. 2, at 1799 (1981) (statement of Rep. Conyers); *Laird*, 408 U.S. at 19 (Douglas, J., dissenting). The Declaration of Independence denounces the King for having "kept among us, in times of peace, Standing Armies without the Consent of our legislatures"; for "affect[ing] to render the Military independent of and superior to the Civil power"; and for "[q]uartering large bodies of armed troops among us." The Declaration of Independence paras. 11, 12, 14 (U.S. 1776); *see* 7 Cong. Rec. 3583–86 (1878) (remarks of Rep. Kimmel).

These grievances were at the forefront of deliberations at the Constitutional Convention, as the founders were reluctant to ratify a constitution that failed to guard against military dominance. *Laird*, 408 U.S. at 22–23 (Douglas, J., dissenting); Major Clarence I. Meeks III, *Illegal Law Enforcement: Aiding Civil Authorities in Violation of the Posse Comitatus Act*, 70 Mil. L. Rev. 83, 87 (1975). The Constitution that emerged incorporates their concerns through the separation of Congress's power to raise and support the Army and to provide and maintain a Navy, in Article I, Section 8, from the President's power as the Commander-in-

Chief, in Article II, Section 2. The Domestic Violence Clause, Article IV, Section Four, provides for military defense of the states upon invasion and, "on Application of the Legislature, or of the Executive (when the Legislature cannot be convened) against domestic Violence"; the military can restore law in the states in the face of domestic disruption, but only upon a determination by Congress (or, in an emergency, the Executive) that military involvement is necessary. *See* 7 Cong. Rec. 4240 (remarks of Sen. Kernan).

The Bill of Rights also incorporates the principle of separating military force from civilian law. The Second Amendment provides for a civilian militia; the Third Amendment prohibits the mandatory quartering of troops; and the Fourth Amendment prohibits unreasonable government intrusion in the form of searches and seizures. *See Laird*, 408 U.S. at 15–18, 22–23 (Douglas, J. dissenting); Doyle, *supra*, at 12; *cf. Bissonette v. Haig*, 800 F.2d 812, 814–15 (8th Cir. 1986) (en banc), *aff'd on other grounds by* 485 U.S. 264 (1988), *abrogated on other grounds as recognized in Engleman v. Deputy Murray*, 546 F.3d 944, 948 & n.3 (8th Cir. 2008) (holding that plaintiffs who alleged that they were seized by the Army in violation of the PCA had stated a Fourth Amendment claim). Indeed, "it is not unreasonable to believe that our Founders' determination to guarantee the preeminence of civil over military power was an important element that prompted adoption of the Constitutional Amendments we call the Bill of Rights." *Laird*, 408 U.S. at 23 (Douglas, J., dissenting) (quoting Earl Warren, *The Bill of Rights and the Military*, 37 N.Y.U. L. Rev. 181, 185 (1962)).

In 1878, when Congress was considering enacting the PCA, its members repeatedly referred to these constitutional

concerns. *See* 7 Cong. Rec. 3583 (remarks of Rep. Kimmel) ("In every page of the history of the earlier period, long before, at the time of, and long after the adoption of the Constitution, the warnings against the dangers of standing armies are loud, distinct, and constant."); *id.* at 4240 (remarks of Sen. Kernan) ("I suppose no one claims that you can use the Army as a *posse comitatus* unless that use is authorized by the Constitution, which it clearly is not, or by act of Congress"); *id.* at 4243 (remarks of Sen. Merrimon) ("The Army, under the Constitution, is not to be used for the purpose of executing the law in the ordinary sense of executing the law. It can only be called into active service for the purpose of suppressing insurrection . . . ."). As these comments evince, when Congress enacted the PCA, it understood that the Act implemented a principle already embedded in the Constitution. *See United States v. Walden*, 490 F.2d 372, 375 (4th Cir. 1974).

Moreover, while it is true that courts generally have in the past *applied* the exclusionary rule only to statutory violations directly implicating the Fourth or Fifth Amendments, *Sanchez-Llamas v. Oregon*, 548 U.S. 331, 348–49 (2006); *see, e.g.*, *Miller v. United States*, 357 U.S. 301, 313–14 (1958); *McNabb v. United States*, 318 U.S. 332, 344–45 (1943), as *Roberts* and other PCA cases reflect, there is no reason why the rule should not be applied to the violation of a statute with such a substantial constitutional foundation. Because of the PCA's constitutional roots, I continue to agree that were an "extraordinary" violation shown, suppression would be warranted. *See Roberts*, 779 F.2d at 568.

I also continue to believe the violation here was extreme in *scope*, in that, without connection to a military purpose, the investigation reached all computers in the state of

Washington running the Gnutella file-sharing network, and similar investigations have occurred in other parts of the United States. *Dreyer*, 767 F.3d at 827–28, 833–35, 836 & n.14.  But because the same variety of case has not arisen before and the Navy assured us at oral argument that its policy has changed, it is not clear that suppression is necessary on the facts of this case.  That is, although the violations were widespread, *repeated* violations have not been shown, *cf. Walden*, 490 F.2d at 373 ("[B]ecause this case presents the first instance of which we are aware in which illegal use of military personnel in this manner has been drawn into question, we decline to impose the extraordinary remedy of an exclusionary rule at this time . . . ."), and therefore it is not clear that suppression is *necessary* to deter future violations.  *Roberts*, 779 F.2d at 568.  If, however, the same or closely similar violations were to occur, suppression would be the appropriate remedy.

---

REINHARDT, Circuit Judge, concurring:

I concur in Judge Christen's majority opinion.  I also concur in Judge Berzon's concurring opinion.  I am in complete agreement with both Judge Christen's and Judge Berzon's views.

---

OWENS, Circuit Judge, joined by SILVERMAN and CALLAHAN, Circuit Judges, concurring in the judgment:

The majority correctly affirms the district court's denial of Dreyer's motion to suppress, and recognizes that "[c]ourts do not invoke the exclusionary rule absent compelling circumstances."   Majority at 22–25 (citing *Hudson v. Michigan*, 547 U.S. 586, 591 (2006), and *Sanchez-Llamas v. Oregon*, 548 U.S. 331, 347–48 (2006)).   But it says that future violations of the Posse Comitatus Act (PCA) could lead to suppression.  Majority at 26–27 (citing *United States v. Roberts*, 779 F.2d 565 (9th Cir. 1986)).  I write separately because I believe that absent express congressional authorization, suppression is not a remedy for PCA violations.

Since we decided *Roberts* nearly 30 years ago, the landscape on suppression has changed.  The Supreme Court has "long since rejected" the broader application of suppression that its earlier decisions suggested, *see Hudson*, 547 U.S. at 591, and "imposed a more rigorous weighing of its costs and deterrence benefits." *Davis v. United States*, 131 S.Ct. 2419, 2427 (2011).   *Hudson* and *Sanchez-Llamas* instruct that before we determine whether police conduct warrants exclusion under the facts of a particular case, we should first decide if the violation can ever result in suppression.  *Hudson*, 547 U.S. at 599 (no suppression for violation of the Fourth Amendment knock-and-announce rule); *Sanchez-Llamas*, 548 U.S. at 350 (no suppression for violation of the right to consular notification of the Vienna Convention on Consular Relations).

Exclusion of evidence to remedy a statutory violation is extremely rare.  The exclusionary rule applies "primarily to

deter constitutional violations." *Sanchez-Llamas*, 548 U.S. at 348. In "[t]he few cases in which [the Court has] suppressed evidence for statutory violations . . . , the excluded evidence arose directly out of statutory violations that implicated important Fourth and Fifth Amendment interests." *Id.* Those cases are easily distinguishable from the PCA.

In *McNabb v. United States*, 318 U.S. 332 (1943), and *Mallory v. United States*, 354 U.S. 449 (1957), the Court suppressed evidence obtained following violations of rules requiring prompt presentment of an arrestee before a magistrate judge. The "supervisory rules [at issue in *McNabb* and *Mallory* are] responsive to the same considerations of Fifth Amendment policy" underlying the *Miranda* doctrine. *Miranda v. Arizona*, 384 U.S. 436, 463 (1966).

And in *Miller v. United States*, 357 U.S. 301 (1958), the Court suppressed evidence obtained after police violated the knock-and-announce rule of 18 U.S.C. § 3109. In *Wilson v. Arkansas*, 514 U.S. 927 (1995), the Court held that the "knock and announce principle" enforced in *Miller* is also "part of the Fourth Amendment reasonableness inquiry." *Id.* at 930.

What constitutional right does the PCA implicate? The majority finds the PCA's "constitutional underpinnings" in the remarks of one senator[1] and the Supreme Court's dicta

---

[1] The majority also cites a Fourth Circuit case, which did not decide that "[t]he PCA was no more than an expression of constitutional limitations," but only recounted congressional debates in which "several senators expressed th[at] opinion." *United States v. Walden*, 490 F.2d 372, 375 (4th Cir. 1974). Majority at 24 n.7. These senators, like the majority, did not cite any specific constitutional text to support their opinions.

discussing a "traditional and strong resistance of Americans to any military intrusion into civilian affairs . . . express[ed], for example, in the Third Amendment's explicit prohibition against quartering soldiers." *Laird v. Tatum*, 408 U.S. 1, 15 (1972). *See* Majority at 24 & n.7. A statement of a senator and dicta from *Laird* are not enough to convert the PCA into the Third Amendment 2.0. The actions of various U.S. Presidents—who at times called on the military to enforce civil laws in the first half of the nineteenth century—strongly suggest that the PCA is not constitutional. *See* H.W.C. Furman, *Restrictions upon Use of the Army Imposed by the Posse Comitatus Act*, 7 Mil. L. Rev. 85, 89 (1960), and sources cited therein.[2]

And even if we draw the lens back far enough to find an abstract constitutional principle against military incursion into civilian affairs, that principle cannot "fairly be characterized as expressly designed to protect the personal rights of [criminal] defendants." *United States v. Dreyer*, 767 F.3d 826, 841 n.3 (9th Cir. 2014) (O'Scannlain, J., dissenting) (quoting *Walden*, 490 F.2d at 377). Any right is "at best remotely connected to the gathering of evidence." *Sanchez-*

---

[2] Indeed, the statements of other senators suggest that the PCA had far more to do with political power than individual privacy. *See, e.g.*, 7 Cong. Rec. 3586 (remarks of Rep. Kimmel) ("[T]he man who holds the Presidency of the United States against the will of the people, clearly expressed according to law, is as surely a monarch as he who by birth or force holds a throne . . . . The silent soldier who commanded the standing Army riveted the chains which the people drag along in lengthening disgrace."); *id.* at 4240 (remarks of Sen. Kernan) (expressing fear that military posse comitatus "might be used for an entire overthrow of the rights of citizens at the polls"); *id.* at 4245 (remarks of Sen. Merrimon) (alleging that the Army "has been used and prostituted to control elections repeatedly" and explaining that the "object of [the PCA] is to prevent a like prostitution of the Army in the future").

*Llamas*, 548 U.S. at 349. An individual defendant like Dreyer has no interest in what uniform the official who monitors his public exchange of child pornography is wearing.

Rather than reach the issues discussed in Parts I–III, I would follow *Hudson* and *Sanchez-Llamas* to hold that PCA violations can never warrant suppression. The PCA's abstract constitutional foundation does not bear the extreme weight that the suppression remedy requires—far more is needed before we elevate the PCA to the same status as the Fourth and Fifth Amendments.

Congress has had ample time to authorize suppression for PCA violations, but it never has. It knows how. *See, e.g.*, 18 U.S.C. § 2518(10)(a) (Title III); 50 U.S.C. §§ 1806, 1825 & 1845 (Foreign Intelligence Surveillance Act). Instead, it chose to enforce the PCA with criminal sanctions. 18 U.S.C. § 1385. Under the Supreme Court's current approach, we lack the power to draft a suppression remedy that we think Congress forgot. We must let Congress authorize the "last resort" of suppression for PCA violations, big or small.

Because I agree with the majority's conclusion that Dreyer's suppression motion must be denied, I respectfully concur in the judgment.

SILVERMAN, Circuit Judge, joined by CALLAHAN, Circuit Judge, concurring in the judgment:

I am at a loss to understand what NCIS Agent Steve Logan did wrong here. At the outset, it is important to note three things:

> *First*, as a Naval criminal investigator, Logan was tasked with looking for Navy personnel who were misusing peer-to-peer software to traffic in child pornography. He was not looking for civilians.

> *Second*, peer-to-peer software, by definition, opens up one's computer to the world. *See United States v. Ganoe*, 538 F.3d 1117, 1127 (9th Cir. 2008).

> *Third*, when Logan discovered that he had stumbled upon a civilian sharing child pornography, he dropped the investigation like a hot potato and did nothing more than turn over his findings to civilian authorities. He had no further involvement whatsoever in the investigation, search, interrogation, or arrest.

In these circumstances, Logan did not violate the Posse Comitatus-like regulations, both because his assistance of civilian law enforcement was "indirect" and because his limited involvement had an "independent military purpose." *See United States v. Hitchcock*, 286 F.3d 1064, 1069–70, *amended and superseded by* 298 F.3d 1021 (9th Cir. 2002). Given that Logan had a right to go on the Internet and look

for those who voluntarily choose to share their computer files with strangers – just as anyone has that right – Logan did nothing that is prohibited, or that even required a warrant. Anyone with the right software can do what Logan did.

This is really no different than Shore Patrol going into a downtown bar that's open to the general public and looking for misbehaving sailors. The Shore Patrol is not there to enforce local laws, but rather "to maintain order and suppress any unseemly conduct on the part of any" sailor on shore leave. 32 C.F.R. § 700.922(a). If they happen to see a civilian crime taking place in front of them, nothing prohibits them from calling the local police, just as anyone might.

Dreyer argues that Logan violated Navy regulations, but tellingly, that's not the *Navy's* interpretations of its regulations. Logan has not been disciplined for carrying out the investigation or told that he may not continue such investigations. Rather, the United States has argued on the Navy's behalf that although Logan was conducting an investigation when he discovered Dreyer's sharing of child pornography, that investigation was permissible both under NCIS's charter (giving agents authority to "conduct[], supervis[e], or coordinat[e] investigations of criminal activity in programs and operations of the Department of the Navy," 10 U.S.C. § 7480(b)) and under Department of Defense and Navy regulations. Those regulations permit certain forms of indirect assistance to civilian authorities, *see* Dep't of Defense Directive ("DODD") 5525.5 E4.1.7, SECNAVINST 5820.7C § 8.d., as well as actions with the primary purpose of furthering a military function, such as enforcing the Uniform Code of Military Justice, which prohibits sharing of child pornography. *See* Article 134, Uniform Code of Military Justice, 10 U.S.C. § 934; DODD 5525.5, E.4.1.2.1.1;

SECNAVINST 5820.7C § 8.c.(1). Indeed, the Navy has consistently interpreted its regulations to not prohibit similar conduct that involved only indirect military assistance or had an independent military purpose. *See, e.g.*, *Hitchcock*, 286 F.3d at 1069–70; *United States v. Chon*, 210 F.3d 990 (9th Cir. 2000) (NCIS agent's conduct did not violate the PCA because it had an independent military purpose); *see also Hayes v. Hawes*, 921 F.2d 100, 103–04 (7th Cir. 1990) (NCIS agents' conduct did not violate the PCA where the agents "merely shared information about drug activity . . . with the police department, aided the police in surveillance . . . , made the undercover buy, and signalled to the police when the transaction was completed").

Contrary to the majority's view, the record does not "demonstrate[] a poor understanding of the restrictions imposed on NCIS's involvement in civilian law enforcement." The Navy's position that Logan's investigation did not violate its regulations is consistent with its longstanding administrative practice, reasonable, and deserving of the court's deference. *See, e.g.*, *Lawrence v. McCarthy*, 344 F.3d 467, 473 (5th Cir. 2003) (deferring to military court interpretations on the basis that they require "interpretation of military forms and standard operating procedures with which we are comparatively less well-versed"). Branches of the military promulgate and administer their own regulations, which the Navy has done here; a reasonable interpretation by the Navy of its own regulation must stand even if there are competing interpretations. *See Champagne v. United States*, 35 Fed. Cl. 198, 210 (1996), *aff'd*, 136 F.3d 1300 (Fed. Cir. 1998) ("[W]hen the meaning of military regulations and instructions are at issue, the armed service's own interpretation must be given controlling weight

and deference, especially when it has been consistently interpreted over a long period of time."). As I have emphasized, "[t]he military's considered professional judgment is not lightly to be overruled by the judiciary." *Meinhold v. U.S. Dep't of Def.*, 34 F.3d 1469, 1476 (9th Cir. 1994) (internal quotations and citation omitted). The Navy, in declining to discipline Agent Logan for his investigation, has implicitly interpreted the regulations to conclude that the regulation was not violated. That reasonable interpretation deserves the court's deference.

But even if *zero* deference were owed to the Navy's interpretation of its own regulations, I would hold that there was no violation. As sketched out above, when Logan started his investigation, it was solely with the aim of identifying Navy or other military personnel who were sharing child pornography online, in violation of the Uniform Code of Military Justice. Such an investigation is clearly in service of a legitimate Navy interest. Although Logan came upon a civilian, defendant Dreyer, distributing child pornography on a peer-to-peer file sharing service as part of this process, that discovery was not Logan's aim. Rather, as demonstrated by Logan's prompt action in turning over the investigation of Dreyer to local civilian law enforcement, his sole purpose was to "further[] a military or foreign affairs function of the United States," DODD 5525.5, E.4.1.2.1; SECNAVINST 5820.7C at 8(c)(1): identifying military service members who are illegally sharing child pornography. Logan had no interest in or jurisdiction over Dreyer's transgressions, and he did nothing more than bring them to the attention of the

relevant civilian authorities, and then wash his hands of the matter. Since Logan's investigation had this independent military purpose, it did not violate the regulations.

I concur in the judgment affirming the denial of the motion to suppress.